**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Tom Rand,

       Plaintiff,

vs.

Michael J. Astrue, Commissioner of
the Social Security Administration,

       Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

No. CV-08-404-TUC-DTF

**ORDER**

     Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision by the Commissioner of Social Security (Commissioner). The parties consented to exercise of jurisdiction by a Magistrate Judge, pursuant to 28 U.S.C. § 636(c)(1). (Dkt. 19.) This case presents five issues on appeal: (1) whether the Administrative Law Judge (ALJ) improperly rejected Plaintiff's credibility; (2) whether the ALJ erred in rejecting a treating doctor's opinion regarding residual functional capacity; (3) whether the ALJ improperly rejected an examining doctor's assessment; (4) whether the ALJ erred in rejecting lay witness testimony; and (5) whether Plaintiff would have been found disabled if the ALJ had properly considered the testimony of Plaintiff, physicians, and lay witnesses. Based on the pleadings and the administrative record, the Court finds Plaintiff is not entitled to relief.

**<u>PROCEDURAL HISTORY</u>**

     Plaintiff filed an application for Social Security disability insurance benefits (DIB) and supplemental security income (SSI) in August 2006. (Administrative Record (AR) 92).

Plaintiff alleges disability from October 16, 2005, to January 11, 2009.[1]  (AR 92; Dkt. 24.)
After Plaintiff's applications were denied, he appealed the denials and appeared and testified
before ALJ Norman R. Buls on October 17, 2007.  (AR 53-70,17-47.)  Subsequent to the
hearing, the ALJ found Plaintiff was not disabled at step five of the analysis because he could
perform other work available in significant numbers in the national economy.  (AR 5-16.)
The Appeals Council denied Plaintiff's request to review the ALJ's decision.  (AR 1-3.)

## FACTUAL HISTORY

Plaintiff was born on May 5, 1964, making him 42 years of age at the time he filed
his DIB and SSI applications.  (AR 92.)  Plaintiff completed high school in 1983; he obtained
a contractors license in 2003.  (AR 113.)  Plaintiff worked as a machinist from 1990 to 1993,
and was a commercial construction supervisor from 1996 to 2005.  (AR 109.)  From 1996,
Plaintiff worked relatively steadily through 2005; however, Plaintiff's earnings were
substantially lower in 2002 and 2003.  (AR 99.)  Plaintiff stopped working on October 16,
2005, after a car accident.  (AR 108.)

After the accident, Plaintiff was treated at University Medical Center in Tucson.  He
was diagnosed with:  fractures of the superior end plates of T7, T8, T9 and T12, and a left
transverse process fracture of L1; moderate degenerative disc disease at C4-C5 and C5-C6;
posterior cervical soft tissue injury and severe cervical sprain; and degenerative changes in
his right shoulder with possible rotator cuff tear.  (AR 208-10, 215, 232-33.)  Plaintiff was
discharged on October 19, 2005, as stable with a back brace and instructions to follow-up
with the neurosurgery department in two weeks.  (AR 232-33.)  At his November 8, 2005
follow-up, Plaintiff reported chest numbness while laying down and occasional numbness
radiating into his left arm and leg; Plaintiff's gait was normal and motor strength was 5/5.
(AR 241.)  He also indicated he was having some bowel urgency, for which he received a
urology referral.  (*Id.*)

---

[1]  Plaintiff died of a gunshot wound on January 11, 2009; this claim is brought by his
survivors/estate.  (Dkt. 24 at 12.)

Plaintiff first saw Dr. Blair Goodsell as a primary care physician on November 16, 2005, at which time he was still wearing a back brace and reported being in a lot of pain. (AR 351.) Dr. Goodsell prescribed Ultram with Tylenol, and Percocet (as needed). (*Id.*) He indicated Plaintiff probably could not work until January but that the specialists might alter the time frame. (*Id.*)

Plaintiff had a second neuro-surgical follow-up on December 20, 2005, at which he reported no numbness and no pain except when laying in bed. (AR 244-45.) The neurologist noted progressive healing of the fractures and indicated the only issue to be pain control. (AR 245.) Plaintiff's bladder control issues had resolved with medication. (*Id.*) On January 3, 2006, Dr. Goodsell noted that Plaintiff was not getting around very well (he was still in a back brace) and was having problems with frequent urination. (AR 228.) Dr. Goodsell indicated Plaintiff might not work for some time and he recommended that the neurosurgeon determine when to release him for work. (*Id.*) Dr. Goodsell certified, for purposes of Family and Medical Leave, that Plaintiff could not work until further notice due to pain. (AR 352-54.)

In his final neurological appointment on January 19, 2006, after which Plaintiff was discharged, he complained of mid-thoracic pain reaching onto his left side. (AR 247-48.) The neurological exam continued to be "unremarkable" and revealed no deficits. (AR 247.) The neurologist released Plaintiff to work in mid-February with a recommendation to pay attention to his actions because pain could cause a fall and re-injury. (AR 248.)

On February 7, 2006, Plaintiff reported he was experiencing pain at the level of 3-6 out of 10; however, the pain did not radiate and he rarely needed to take the prescribed Percocet. (AR 226.) Plaintiff was not having any bowel symptoms. (*Id.*) Dr. Goodsell referred Plaintiff to Dr. Cary for pain control and recommended an orthopedist for his rotator cuff tear. (*Id.*) He noted that Plaintiff had been released to work and that Plaintiff wanted to work contingent on pain control. (*Id.*) On February 8, in a follow-up with the urologist, Plaintiff was continued on medication, which had improved his urgency issues. (AR 273.) After this appointment, Plaintiff stopped all medical treatment for more than a year due to

a lapse in insurance.

On October 31, 2006, Plaintiff was examined by Dr. Randy Soo Hoo of the Integrative Pain Clinic. (AR 275.) Plaintiff reported constant back pain radiating to both legs; increased pain with sitting, walking for an hour (particularly downhill), and standing for more than a few minutes; stiffness when arising in the morning; stiffness and decreased range of motion in his shoulder; and decreased range of motion in his left wrist. (AR 276.) Dr. Soo Hoo observed Plaintiff sitting without discomfort, he rose to greet the doctor without difficulty, his gait was normal, and he had no problem getting on the examination table. (AR 277.) The doctor noted range of motion limitations in the left wrist, right shoulder, and spine, as well as diminished strength on the left leg and lumbar pain doing straight leg raises. (AR 277-78.) Dr. Soo Hoo concluded Plaintiff could lift twenty pounds occasionally and ten pounds frequently; stand/walk less than two hours of a work day; sit up to six hours of a work day; occasionally climb stairs and ramps, and stoop; frequently balance; with the left upper extremity, reach in all directions and occasionally handle and frequently finger and feel; with the upper right extremity, reach in all directions except overhead, and frequently handle, finger and feel. (AR 278.)

Dr. John Fahlberg reviewed Plaintiff's records and, without an examination, on November 24, 2006, completed a Physical Residual Functional Capacity Assessment (RFCA). (AR 288.) Dr. Fahlberg concluded Plaintiff could occasionally lift twenty pounds; frequently lift ten pounds; stand/walk six hours in an eight-hour day; sit six hours in an eight-hour day; frequently climb ramp/stairs, balance and kneel; occasionally stoop, crouch and crawl, and never climb ladders/ropes/scaffolds; and that he had limitations for reaching overhead with right arm and fingering with left arm. (AR 289-91.) Dr. Fahlberg noted that the records indicated Plaintiff's pathology was mild, his gait was normal and he had good function according to Dr. Soo Hoo. (AR 289.) Further, he opined that Dr. Soo Hoo's examination and Plaintiff's injury did not support a less-than six-hour-restriction on standing. (AR 294.)

On March 21, 2007, Dr. Jack Marks also completed an RFCA, based on a review of

Plaintiff's records. (AR 308-15.) Dr. Marks's limitation findings were essentially the same as those set forth by Dr. Fahlberg. (*Id.*) Dr. Marks stated that Dr. Soo Hoo's findings did not support the degree of limitation Dr. Soo Hoo listed. (AR 314.)

On April 24, 2007, Plaintiff completed a function report. (AR 163-70.) Plaintiff indicated he lived with family and that daily he would prepare quick ten-minute meals and do chores around the house and yard until he was in pain (thirty to sixty minutes). (AR 163, 165.) Plaintiff's sleep was affected by leg cramps and headaches. (AR 164.) Plaintiff's thirteen-year-old daughter stayed with him every other weekend, and he cared for a dog with his parents help. (AR 164.) Plaintiff would drive, go out alone, and shop a few times a month for approximately an hour. (AR 166.) He was no longer able to play sports, and while he visited with friends, he did not go anywhere on a regular basis. (AR 167.) Plaintiff said his ability to lift, squat, bend, stand, walk, sit, stair climb and use his hands were effected, as was his memory, ability to complete tasks, concentrate and understand, and get along with others. (AR 168.) Plaintiff said he could lift ten pounds and walk approximately 500 feet before resting. (*Id.*)

When Plaintiff again obtained insurance coverage, he returned to Dr. Goodsell. On April 30, 2007, Dr. Goodsell recorded that Plaintiff had been in chronic pain since the accident, that it radiated down his left leg, and it was a ten out of ten without medication. (AR 343.) He prescribed MS Contin 15 mg and Percocet #60. (*Id.*) He prescribed Lexapro for depression and noted that Plaintiff was having migraine headaches that would impair him for two to three days. (*Id.*) Dr. Goodsell referred Plaintiff to Dr. Cary regarding his neurological pain. (*Id.*)

On May 1, 2007, Plaintiff's father filled out a function report in which he stated that Plaintiff spent most of his time in bed alone. (AR 182.) His father's report was similar to his own, although his father indicated Plaintiff did chores for only ten to fifteen minutes, three days a week, and shopped only once a month for approximately fifteen minutes. (AR 183-88.) Plaintiff's friends, Jim Flowers (May 5, 2007 report) and Debra Meyer (October 15, 2007 report), each confirmed some of the information provided in the other function

reports.  (AR 190-97, 198-205.)

On May 21, 2007, Dr. Goodsell recorded that Plaintiff "looks like a different person, he actually looks great," and that Plaintiff reported his pain to be controlled at a two out of ten. (AR 341.)  Plaintiff had an appointment with Dr. McCormick that week regarding his shoulder. (*Id.*)  Dr. Goodsell continued the Percocet #60, MS Contin 15 mg, and Lexapro. (AR 341-42.)  On June 21, 2007, Dr. Goodsell increased Plaintiff's Lexapro dosage and referred him to mental health. (AR 338.)  The doctor recorded that Plaintiff's pain was at a four out of ten, which was exacerbated with activity, but it was not radiating down his legs. (*Id.*)  The doctor noted that Plaintiff's low spine was very rigid and he had painful range of motion to the lumbar spine. (*Id.*)  Dr. Goodsell increased Plaintiff's MS Contin to 30 mg, continued the Percocet #60, and summarized that Plaintiff "basically does okay." (*Id.*)

In June 2007, Dr. Goodsell completed a Medical Assessment of Ability to do Work-Related Activities regarding Plaintiff. (AR 323-25.)  Dr. Goodsell indicated Plaintiff could lift for less than one-third of a work day; stand/walk for one hour in ten-minute intervals; sit for three hours in twenty minute intervals; frequently balance; occasionally climb, stoop, crouch, and kneel; and never crawl or push/pull. (AR 323-24.)  Dr. Goodsell found that on more than three to four days per month Plaintiff would be unable to complete a work day. (AR 325.)  The doctor listed the onset date as October 16, 2005, and opined that the limitations had lasted and/or could be expected to last for more than twelve months. (*Id.*)

On July 20, 2007, Plaintiff reported to Dr. Goodsell that "he feels 100 percent better on the Lexapro 15 mg," and his headaches were gone; the doctor continued that medication. (AR 336.)  Plaintiff reported his pain was controlled at a one out of ten, his shoulder was much better, and he was getting out and doing things. (*Id.*)  Although Plaintiff had tenderness in the lower thoracic spine, Dr. Goodsell noted that the range of motion was good. (*Id.*)  Dr. Goodsell continued the MS Contin 30 mg and Percocet #60. (AR 336-37.)

On August 21, 2007, Plaintiff reported having good and bad days with his back pain but that he was doing okay with the MS Contin and Percocet; the doctor continued those prescriptions. (AR 329.)  Dr. Goodsell recorded that Plaintiff ambulated without problem,

but the range of motion in his back was painful and he was very tender in the lower thoracic and upper lumbar areas.  (*Id.*)  In addition, Plaintiff was experiencing problems with asthma, his cholesterol was high and thyroid was low, and he was referred for vision difficulties.  (*Id.*)

On September 21, 2007, Plaintiff indicated the MS Contin was not lasting; Dr. Goodsell adjusted the dosage and schedule for taking it.  (AR 326.)  He also continued the Percocet but was hopeful he would be able to discontinue it soon.  (*Id.*)  Plaintiff was tender in the lower thoracic and upper lumber area, and his range of motion was painful but unlimited to the low back.  (*Id.*)  Plaintiff reported that his shoulder was doing well with better mobility, and his depression was doing well, but his asthma was problematic.  (*Id.*)  Dr. Goodsell said that overall, Plaintiff "was actually doing okay."  (*Id.*)

At the hearing on October 17, 2007, Plaintiff indicated he had begun to build a house in Herford, Arizona, but since the accident he had moved in with his parents in Bisbee, Arizona.  (AR 17, 21.)  Plaintiff testified that the reason he could not work was pain in his back and shoulder.  (AR 22.)  Plaintiff said he was on morphine three times a day, with Percocet in between as needed, that he had trouble getting up in the morning, he laid down three to four times a day due to pain, and he would have trouble walking and his legs would hurt.  (AR 23.)  Plaintiff indicated he had a gap in treatment because his employer health insurance was cancelled and then his insurance through Access got cancelled, and it took time to get it reinstated.  (AR 30.)  Plaintiff indicated he intended to follow-up with the referral to the pain specialist, Dr. Cary, and a psychiatrist.  (AR 30-31.)  Plaintiff testified that he had suffered from incontinence since the accident but he had not followed-up further on it because of lack of insurance.  (AR 33-34.)

A vocational expert, Kathleen Malcopine, testified at the hearing.  (AR 35.)  The ALJ asked the expert to assume Plaintiff had the following limitations, which were based on Dr. Marks's assessment:  lifting and pushing/pulling twenty pounds occasionally and ten pounds frequently; standing/walking and sitting each for up to six hours of an eight hour day with normal breaks; frequently climb ramps and stairs, balance, reach overhead and finger with

- 7 -

his left hand; occasionally stoop and reach overhead with his right hand (fingering unlimited with right hand); and never climb ladders, ropes or scaffolds, kneel, crouch or crawl. (AR 37, 39.) Malcopine testified those limitations would prevent a person from performing Plaintiff's past relevant work. (AR 37.) However, she concluded a person with those restrictions could perform other work available in substantial numbers in the economy. (*Id.*) Specifically, she listed as possible jobs security guard, dispatcher, and parking lot attendant. (AR 38.) Malcopine stated that if she took into account Plaintiff's testimony that he needed to lay down during the day and had problems concentrating, that he would not be capable of employment. (AR 40.) A hypothetical based on the restrictions set forth by Dr. Goodsell, which totaled only four hours of standing/walking/sitting in a day, would preclude full-time employment. (AR 43.)

The ALJ concluded that Plaintiff had the following severe limitations: musculoskeletal injuries involving his left wrist, right shoulder, and thoracic and lumbar spines. (AR 10.) The ALJ found that Plaintiff had the residual functional capacity to lift/carry ten pounds frequently and twenty pounds occasionally; stand/walk and to sit each for six hours of an eight-hour day; frequently climb ramp/stairs, balance, handle, finger, and reach over head with the left arm; occasionally stoop and reach overhead with the right arm; but never climb ladder/rope/scaffold, kneel, crouch, crawl; and avoid cold, vibrations and hazards. (AR 13.) Based on that residual functional capacity, the vocational expert opined that Plaintiff could not perform his past work but could perform other jobs available in significant numbers in the economy. (AR 14-15.) The ALJ adopted that opinion and determined that Plaintiff was not disabled. (*Id.* at 14-16.)

## **STANDARD OF REVIEW**

The Commissioner employs a five-step sequential process to evaluate DIB and SSI claims. 20 C.F.R. §§ 404.1520, 416.920; *see also Heckler v. Campbell,* 461 U.S. 458, 460-462 (1983). To establish disability the claimant bears the burden of showing he (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment meets or equals the requirements of a listed impairment; and (4) claimant's residual functional capacity

(RFC) precludes him from performing his past work. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

In this case, Plaintiff was denied at step five of the evaluation process. The step five determination is made on the basis of four factors: the claimant's RFC, age, education and work experience. *Hoopai*, 499 F.3d at 1074. "The Commissioner can meet this burden through the testimony of a vocational expert or by reference to the Medical Vocational Guidelines." *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir.2002).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)). The findings of the Commissioner are meant to be conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla but less than a preponderance." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992)). The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). This is so because the ALJ "and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney,* 981 F.2d at 1019 (quoting *Richardson v. Perales*, 402 U.S. 389, 400 (1971)); *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1198 (9th Cir. 2004). The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (citing *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)). Reviewing courts must consider the evidence that supports as well as detracts from the Commissioner's

conclusion. *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975).

**ANALYSIS**

**Plaintiff's Credibility**

Plaintiff argues the ALJ erred by rejecting his symptoms of pain based solely on the objective medical evidence. The ALJ made the following credibility assessment in relation to Plaintiff's RFC:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.
>
> The claimant testified to an inability to work due to left wrist problems, back pain, shoulder pain, asthma, bladder problems, memory problems and depression. The objective medical findings and the level of treatment, however, are not suggestive of this level of severity. In the absence of objective medical evidence to support these allegations, the ALJ gives minimal weight to this testimony. The claimant's complaints regarding the frequency, severity and duration of his back pain, shoulder pain, neck pain, lower extremity pain, and urinary incontinence do not justify any further limitations than those based on the objective medical evidence and are generally consistent with the limitations found. The claimant's complaints of depression and memory problems are not mentioned with any frequency in the medical records and there is very little treatment directed toward such complaints. There are no reported continuous side effects of medication. When side effects are mentioned, the treatment notes reflect that the medication was adjusted or changed.

(AR 14.)

In general, "questions of credibility and resolution of conflicts in the testimony are functions solely" for the ALJ. *Parra v. Astrue,* 481 F.3d 742, 750 (9th Cir. 2007) (quoting *Sample v. Schweiker,* 694 F.2d 639, 642 (9th Cir. 1982)). However, "[w]hile an ALJ may certainly find testimony not credible and disregard it . . . [the court] cannot affirm such a determination unless it is supported by specific findings and reasoning." *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 884-85 (9th Cir. 2006); *Bunnell v. Sullivan*, 947 F.2d 341, 345-346 (9th Cir. 1995) (requiring specificity to ensure a reviewing court the ALJ did not arbitrarily reject a claimant's subjective testimony); Social Security Ruling (SSR) 96-7p. "To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035-36

(9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* at 1036 (quoting *Bunnell,* 947 F.2d at 344). The ALJ found Plaintiff had satisfied part one of the test by proving impairments that could produce the symptoms alleged. Second, if "there is no affirmative evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Tommasetti v. Astrue,* 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281, 1283-84 (9th Cir. 1996)). The ALJ did not make a finding that Plaintiff was malingering; therefore, to support his rejection of Plaintiff's assertions regarding the severity of his symptoms, the ALJ had to provide clear and convincing, specific reasons. *See Vasquez v. Astrue*, 547 F.3d 1101, 1105 (9th Cir. 2008) (quoting *Lingenfelter*, 504 F.3d at 1036).

"The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). When assessing a claimant's symptoms, the ALJ should consider, in addition to objective medical evidence, his daily activities; the location, intensity, frequency and duration of the symptom; factors that trigger or exacerbate the symptom; the effectiveness of any medication to alleviate the symptom and any side effects; treatment the claimant receives for relief of the symptom; any steps other than treatment used to relieve the symptom (such as lying down or changing position); and any other factors relevant to claimant's limitations due to the symptom. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p. In assessing credibility the ALJ can also consider the claimant's "reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (citing *Smolen*, 80 F.3d at 1284).

Plaintiff contends the ALJ rejected his credibility *solely* because he found it not substantiated by the medical evidence, which he properly notes is prohibited. *See Light*, 119

F.3d at 792; SSR 96-7.  Although one sentence of the ALJ's opinion stated that he was giving Plaintiff's symptoms minimal weight because they were not supported by the medical findings, he relied on other evidence as well.  Plaintiff does not contradict the ALJ's finding that his symptoms are not fully supported by medical findings; to the contrary, he argues "[t]he objective medical evidence, by itself, did not substantiate Mr. Rand's statements regarding the intensity, persistence, and limiting effects of his symptoms."  (Dkt. 24 at 14.) The ALJ sighted not only the medical evidence, which is relevant and appropriately considered, *see Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005), but also the level of treatment Plaintiff had received, the effectiveness of the prescriptions with which Petitioner had been treated, and inconsistencies between his reported symptoms and the level of limitations he asserted they imposed.

Citing the relevant regulations, 20 C.F.R. §§ 404.1529, 416.929, SSR 96-7p, the ALJ stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and *other evidence*."  (AR 13 (emphasis added).)  The ALJ reviewed Plaintiff's complaints of pain in his back, shoulder, neck and extremities, as well as bladder problems and depression. Plaintiff argues the ALJ ignored his testimony regarding his need to rest during the day, the limitations on his activities and ability to stand, and the pain that travels down to his leg.  To the contrary, it is this testimony regarding his limitations that the ALJ found not entirely credible because it was inconsistent with the symptoms and other evidence.  The basis for that decision is reviewed in detail below.

Plaintiff argues the level of treatment he received should not have been used to discount his credibility because his limited treatment was due to his lack of insurance.  This does not reflect the entirety of the record, because he did not avail himself of all available treatment while insured, nor did the ALJ rely particularly on Plaintiff's lack of treatment during his uninsured period.  Plaintiff's asserted impairments, the treatment and his progress are evaluated below.

Plaintiff was discharged from treatment for his injuries resulting from the car accident

(back, neck, lower extremities) on January 19, 2006, by his neurologist, who released him to begin working in mid-February of that year. (AR 247-48.) When he saw Dr. Goodsell in February 2006, he reported that he rarely used the Percocet available to him. (AR 226.) However, he was experiencing back pain and Dr. Goodsell prescribed MS Contin 15 mg and referred him to a pain clinic. (AR 226.) Plaintiff never followed-through on that referral prior to losing his insurance. When he returned to Dr. Goodsell in April 2007, he again referred him to Dr. Cary at the pain clinic. (AR 343.) At the time of the October 2007 hearing, Plaintiff had never been to see Dr. Cary. (AR 30-31.) Further, in the period from April to September 2007, Plaintiff's pain improved significantly and medication adjustments were made as needed; Dr. Goodsell generally reported that Plaintiff was doing okay. (AR 326, 329, 336, 338, 341.) After the April 2007 appointment, when Plaintiff obtained pain medication, he did not report any further radicular pain to his lower extremities. (AR 326, 329, 336, 338, 341.)

Plaintiff's shoulder problems were degenerative with a possible rotator cuff tear, they were not created by the car accident and no treatment was provided at that time. (AR 228, 265, 232-273.) When Plaintiff saw Dr. Goodsell in February 2006, he told him to see an orthopedist for his shoulder (AR 226); no appointment is documented prior to Plaintiff losing his insurance. When he was evaluated by Dr. Soo Hoo, Plaintiff indicated he was scheduled for a surgical evaluation of his shoulder (AR 276); there is no record of such an evaluation. On May 21, 2007, Dr. Goodsell noted that Plaintiff had an appointment with Dr. McCormick that week regarding his shoulder. (AR 341.) By July 2007, Plaintiff reported that his shoulder was doing much better, and Dr. Goodsell found good movement in his shoulder. In September 2007, Dr. Goodsell again noted that Plaintiff's right shoulder was doing "pretty good," and had improved mobility. (AR 326.)

Plaintiff had a documented wrist injury prior to his car accident, for which he has a fifteen percent disability rating. (AR 28.) No records reflect any treatment for the wrist during the relevant time period. At the hearing, Plaintiff testified to experiencing some memory problems. (AR 32.) There are no medical records reflecting that Plaintiff reported

memory problems or sought any treatment for that issue.

When Plaintiff saw Dr. Marsella on December 20, 2005, and Dr. Goodsell on February 7, 2006, he reported that he had no ongoing bladder problems (AR 226, 245); throughout his 2007 appointments with Dr. Goodsell (AR 326, 329, 338, 341, 343), he never reported bladder problems and, in July 2007, he explicitly denied any bowel or urinary trouble (AR 336). These treatment reports contradict his testimony that he had suffered from incontinence since the accident. (AR 33-34.)

Plaintiff first reported problems with depression to Dr. Goodsell in April 2007. (AR 343.) Over the next five months, Dr. Goodsell prescribed Lexapro and adjusted the dosage; Plaintiff reported feeling much improved from it. (AR 338, 341.) Dr. Goodsell referred Plaintiff to see a mental health professional in April and June 2007 (AR 338, 343); as of the October 2007 hearing, Plaintiff had not made an appointment based on that referral (AR 31).

Plaintiff cites SSR 96-7p, which provides that:

> Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lends supports to an individual's allegations of intense and persistent symptoms.

While Petitioner did take increasing doses of MS Contin to control his pain, he had made significant progress and Dr. Goodsell remained hopeful that he would be able to discontinue the Percocet. (AR 326.) Further, Plaintiff does not acknowledge that, with the exception of his shoulder (for which he effectively sought specialty treatment), he did not follow-through on the referral to a pain clinic nor did he seek any alternative treatments or treating sources. Overall, his choice to treat his back pain solely with medication prescribed by Dr. Goodsell does not bolster his allegations regarding the severity of his symptoms. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1039-40 (9th Cir. 2008) (finding positive response to conservative treatment and declining to seek alternative treatment undermined report of disabling pain).

The record supports the ALJ's findings that Plaintiff's symptoms were not substantiated by the objective medical findings; the level of treatment he received did not

indicate the severity to which he testified; and the treatment including prescriptions were effective without deleterious side effects. These reasons provided by the ALJ were sufficiently clear and convincing to support his discrediting of Plaintiff's testimony regarding the severity of his limitations.

**Treating Physician's Opinion**

Plaintiff argues that Dr. Goodsell's opinion should have been given controlling weight. The ALJ conducted the following assessment of Dr. Goodsell's opinion:

> On January 3, 2006, . . . Dr. Goodsell stated the claimant was unable to work at this time (Exhibit 3F). The ALJ gives minimal weight to Dr. Goodsell's assessment of disability, as the medical evidence indicates this was the claimant's first visit with Dr. Goodsell. Thus, there is no longitudinal physician/patient relationship. Moreover, the objective medical findings do not support such an extreme assessment. The claimant's musculoskeletal exam reveals right shoulder weakness with a good range of motion; good upper arm strength; and left shoulder, wrists, elbows, hips, knees, and ankles without redness, warmth, swelling, or erythema. Dr. Goodsell recommended Zantac and Tagamet (Exhibit 3F/4).
>
> . . . .
>
> In a Medical Assessment of Ability to do Work Related Activities, dated June 20, 2007, Dr. Goodsell assessed the claimant was unable to perform a full range of sedentary work. Specifically, he could stand/walk for a total of 1 hour in an 8-hour workday; sit for a total of 3 hours in an 8-hour workday; frequently balance; occasionally climb, stoop, crouch, kneel; and never crawl. He had a limited ability to push/pull and would miss more than 3 days of work per month. Dr. Goodsell assessed these limitations were applicable as of October 16, 2005 (Exhibit 14F). The ALJ gives minimal weight to this assessment of disability, as it is simply not supported by the objective medical findings. There is no longitudinal confirmation of consistently severe limitations that would preclude the performance of a wide range of light work for a continuous period of 12 months. Moreover, this opinion is brief and conclusory in form with little in the way of clinical findings to support its conclusion. The records are devoid of any description of detailed examinations. Nor do the records contain any laboratory tests, i.e., x-rays, MRI scans which would support his opinion. Dr. Goodsell's opinion is not consistent with his own findings or other substantial evidence of record including the objective findings and observations, notes and opinions of other treating and examining physicians. On the whole, the doctor appears to have accepted the claimant's subjective complaints, and the above-noted opinions appear reflective of a position of "advocate" for the patient. As such, Dr. Goodsell's opinion is not supported by the overall evidence of the record and it is not afforded significant weight in this decisionmaking process in accordance with SSR 96-5[p].

(AR 12-13.)

If a treating doctor's opinion is not contradicted, the ALJ must provide "clear and

convincing" reasons to reject it. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (quoting *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991)). If a treating doctor's opinion is contradicted by another physician, the ALJ may reject it, if he provides "'specific and legitimate reasons' supported by substantial evidence." *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)).

The governing regulations provide significant guidance regarding the factors the ALJ should consider when evaluating medical opinions. Specifically, if a treating physician's opinion is well-supported and not inconsistent with substantial evidence in the record, then the ALJ should give it controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). If the treating doctor's opinion is not given controlling weight then, in assessing the weight it will be given, the ALJ considers the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician, and the "nature and extent of the treatment relationship" between the patient and the treating physician. 20 C.F.R. §§ 404.1527(d)(2)(i)-(ii), 416.927(d)(2)(i)-(ii). Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs" and their evidentiary requirements', and the degree of his or her familiarity with other information in the record. 20 C.F.R. §§ 404.1527(d)(3)-(6), 416.927(d)(3)-(6).

As an initial matter, Plaintiff disputes the ALJ's rejection of Dr. Goodsell's opinion that Plaintiff could not work as of January 2006. At that time, Dr. Goodsell opined that Plaintiff could not work at all and that it did not look like he would be able to work "for quite a while." (AR 228, 352-54.) Plaintiff is correct that this opinion was in concurrence with Plaintiff's treating neurosurgeon, Dr. Marsella, who had not released Plaintiff yet for work. Thus, Plaintiff is technically correct that the ALJ's rejection of Dr. Goodsell's January opinion is not supported by substantial evidence. Dr. Goodsell had advised that Dr. Marsella

was the appropriate person to release Plaintiff for work. (AR 228.) Dr. Marsella did so as of mid-February 2006, approximately four months after he stopped working due to the car accident. A determination of disability requires a finding that claimant's impairment(s) has lasted for twelve months or is expected to last for twelve months. 20 C.F.R. §§ 404.1505(a), 416.905(a). Dr. Goodsell's January opinion did not include any time parameters on Plaintiff's inability to work and, thus, although undisputed, it is essentially irrelevant. Dr. Goodsell did not opine again on Plaintiff's limitations and ability to work until June 2007. It is that opinion, which was given limited weight by the ALJ, that is relevant and analyzed below.

Plaintiff contends that Dr. Goodsell's opinion of his residual functional capacity was not contradicted, but supported, by other evidence in the record. The Court disagrees. Dr. Goodsell's June 2007 opinion, regarding Plaintiff's inability to work since October 2005 and his functional limitations, was contradicted by Plaintiff's neurosurgeon, an examining physician and two non-examining physicians. First, Dr. Marsella released Plaintiff to work as of mid-February 2006, with no specific limitations. (AR 248.) Second, the examining physician and both non-examining physicians determined that Plaintiff could stand/walk from two to six hours in a work day and could sit for up to six hours in a work day (AR 278, 289, 309); in contrast, Dr. Goodsell found that Plaintiff could only stand/walk for one hour per day and sit for three hours per day (AR 323). Dr. Goodsell's ultimate conclusions were contradicted by all of the other medical opinions in the record. Because it is inconsistent with substantial evidence in the record, it was not entitled to controlling weight.

Although contradicted, the ALJ still was required to provide specific reasons supported by substantial evidence to reject it. The ALJ provided the following reasons for discounting Dr. Goodsell's opinion: it was not supported by the objective medical findings; it was brief and conclusory without supporting clinical findings, such as detailed examinations, lab tests, x-rays or MRIs; "[t]here is no longitudinal confirmation of consistently severe limitations" precluding light work for a continuous twelve-month period; it was inconsistent with his own and other's findings; the doctor appears to have been a

patient advocate, who accepted Plaintiff's subjective complaints; and it is not supported by the overall record.

As objective medical evidence in support of Dr. Goodsell's opinion, Plaintiff points to the MRIs, CT scans, and x-rays from the hospital in 2005, as well as Dr. Goodsell's records that Plaintiff had difficulty flexing, side bending, rotating and moving his right shoulder. It is undisputed that Plaintiff suffered from musculoskeletal injuries in October 2005, which are documented by objective medical evidence; however, in follow-up appointments for those injuries Plaintiff's gait was normal, motor strength was 5/5 and neurological exam normal (AR 241, 244-45, 247), and scans revealed his injuries were healing (AR 245, 247, 271). In February 2006, Dr. Goodsell recorded, "[o]bjectively you find nothing but subjectively he hurts to flex, rotate and side bend in the thoracic area and he is tender along the thoracic spine." (AR 226.) In sum, up through February 2006, the objective medical evidence indicated Plaintiff's injuries from the car accident were healing. The only medical evidence in the record from February 7, 2006, to April 30, 2007, is Dr. Soo Hoo's October 2006 exam. (AR 282-85.) Dr. Soo Hoo observed that Plaintiff stood from a seated position and climbed onto the examination table without difficulty, and he ambulated with a normal gait. (AR 284.) Plaintiff had diminished range of motion in the left wrist, right shoulder and lumbar spine. (AR 284-85.) Testing indicated radiculopathy to lower extremities. (AR 285.)

The objective medical evidence collected by Dr. Goodsell regarding Plaintiff's back and right shoulder from April 30, 2007, through September 2007, is summarized below. On April 30, 2007, Dr. Goodsell recorded weakness in Plaintiff's right rotator cuff, limited abduction but okay internal/external rotation; knee and ankle jerks were fine and straight leg test was negative. (AR 343.) On May 21, 2007, Plaintiff had unlimited range of motion to the right shoulder and back; knee and ankle jerks were good; straight leg raise was negative; and gait was normal. (AR 341.) When examined on June 21, 2007, Plaintiff's lower spine was rigid as was his gait; his shoulders, wrists, elbows, hips, knees and ankles were fine; and straight leg raise and knee and ankle jerks were fine. (AR 338.) As of July 20, 2007,

Plaintiff's range of motion in his back was good, and arm and leg joints were freely moveable with no redness, warmth or erythema. (AR 336.) The August 21 and September 21, 2009 exams were similar, but included reports of normal gait and ambulation without difficulty, good knee and ankle jerks, and negative straight leg raise. (AR 329.) These findings amount to occasional range of motion limitations in Plaintiff's right shoulder and back. Thus, there is substantial evidence to support the ALJ's determination that the objective medical evidence did not support Dr. Goodsell's opinion of significant limitations.

The ALJ found the records did not provide longitudinal confirmation that Plaintiff's limitations were consistently severe such that light work was precluded for a twelve-month period. Substantial evidence, including Dr. Marsella's work release and the objective medical findings, indicate Plaintiff was improving and could have returned to work in February 2006. Similarly, Dr. Soo Hoo's, Dr. Fahlberg's and Dr. Marks's findings from 2006 and 2007 indicated Plaintiff had the ability to work an eight-hour day. Because Dr. Goodsell did not treat Plaintiff from February 2006, to April 2007, she had no personal basis for her opinion regarding his limitations during that time period. Once Plaintiff returned to Dr. Goodsell in April 2007, and began receiving treatment, the records demonstrate that his pain decreased significantly and he was functioning fairly well. Dr. Goodsell expressed hope, in September 2007, that Plaintiff could stop taking Percocet. (AR 326.) Thus, there is substantial evidence to support the ALJ's rejection of Dr. Goodsell's finding of a twelve-month-or-longer period of severe limitations. Additionally, as pointed out by the ALJ, Dr. Goodsell's treatment notes contradict his assessment that Plaintiff had severe limitations and could not work.

The ALJ was correct that Dr. Goodsell did not offer clinical findings to support his assessment of Plaintiff's limitations, which were brief and conclusory. The form he completed requested medical findings to support each category impacted by Plaintiff's impairments. With respect to lifting/carrying, standing/walking, sitting, and postural activities, Dr. Goodsell left the medical findings section blank. (AR 323-24.) Only in the section noting a pushing/pulling limitation, did Dr. Goodsell cite low back pain as the

medical finding that supported that limitation. (AR 324.) Dr. Goodsell's treatment records indicate Plaintiff was improving and his pain was successfully being controlled; therefore, as found by the ALJ, Dr. Goodsell's contradictory opinion regarding Plaintiff's limitations suggest advocacy not based on medical findings.

In sum, Dr. Goodsell's opinion was not supported by the objective medical findings, his opinion was brief and unsupported, and contemporaneous treatment notes indicate improvement contrary to his opinion regarding Plaintiff's limitations. *See Batson*, 359 F.3d at 1195 (approving an ALJ discrediting treating physician's opinion that was brief and conclusory and not supported by the record or medical findings). The ALJ provided specific reasons to give limited weight to Dr. Goodsell's opinion, and those reasons were supported by substantial evidence in the record. Therefore, this portion of his decision was not error.

### **Examining Physician's Opinion**

Plaintiff alleges the ALJ improperly rejected a portion of Dr. Soo Hoo's opinion. The ALJ stated that he found Dr. Soo Hoo's assessment "with the exception of the stand/walk limitation is consistent with the limitation found herein. The ALJ gives minimum weight to Dr. Hoo's limitation to stand/walk for a total of 2 hours in an 8-hour workday, as it is not supported by the objective medical findings." (AR 12.)

The records indicate the doctors were not of a uniform opinion regarding the walking/standing limitations to which Plaintiff was subject. Four doctors opined specifically on Plaintiff's walking/standing limitations: Dr. Soo Hoo determined less than two hours in a day (10/2006); Drs. Fahlberg (11/2006) and Marks (3/2007) both concluded up to six hours in a day; and Dr. Goodsell limited it to one hour per day (6/2007). Also relevant is that Dr. Marsella released Plaintiff to construction work in February 2006, with a caution but no limitations. Thus, no doctors were of the same opinion as Dr. Soo Hoo and three of them were less restrictive – Dr. Marsella imposed no limitations and Drs. Fahlberg and Marks only limited standing/walking to six hours per day. Further, the more restrictive opinion of Dr. Goodsell was rejected by the ALJ for a number of specific reasons addressed above.

The only objective medical findings were periodic range of motion limitations in

Plaintiff's shoulder and back. At the time Dr. Soo Hoo examined Plaintiff, he noted an indication of radiculopathy to the lower extremities; however, that was not the case at other times that Plaintiff was examined and being treated. In particular, there was no pain into Plaintiff's legs when released to work by Dr. Marsella in January 2006, nor did he report any pain radiating down his leg after he returned to treatment with Dr. Goodsell, from May 2007, forward.

There was substantial evidence, both medical opinions and objective medical evidence, to support the ALJ's finding that Plaintiff could stand for six hours per day, rather than the two hours per day reported by Dr. Soo Hoo.

**Lay Witness Testimony**

Plaintiff contends the ALJ rejected the lay witness testimony of his father, Al Rand, and his friends, Jim Flowers and Debra Meyer, with no explanation. Although they did not testify at the hearing, Plaintiff submitted written function reports from Rand, Flowers and Meyer. The ALJ did not refer to this information in his opinion.

Al Rand, Plaintiff's father, completed a function report on May 1, 2007. His father said he spent ninety percent of the day with him and that Plaintiff primarily stayed in bed alone. (AR 182.) Rand reported that Plaintiff cared for his daughter one weekend a month and took care of a dog but that Rand would help with the dog if Plaintiff was in pain. (AR 183.) Plaintiff prepared lunch for himself about four times a week, but his cooking habits had changed because standing caused him pain. (AR 184.) Rand stated that Plaintiff did ten to fifteen minutes of household chores, three times a week; he did not do more because it caused back pain. (AR 184-85.) Plaintiff got outside for about five minutes a day, could drive, and would shop once a month for groceries or clothes (for about fifteen minutes). (AR 185.) Rand indicated Plaintiff saw friends about once a week but had no regular activities. (AR 186.) Plaintiff's injuries impacted his ability to lift, squat, bend, stand, reach, walk, sit, kneel, and stair climb, as well as his memory, ability to complete tasks and concentrate; all physical motions caused his back to hurt. (AR 187.) Rand estimated Plaintiff could walk a city block before needing to rest. (*Id.*)

On May 5, 2007, Plaintiff's friend of twenty-five years, Jim Flowers, completed a function report. (AR 190.) Flowers reported spending ten hours a day with Plaintiff; he said Plaintiff lays in bed "a lot," does small chores, watches television and drinks beer with Flowers. (*Id.*) Flowers stated that Plaintiff sometimes cared for his daughter and took care of his dog, and his parents helped him. (AR 191.) Flowers indicated Plaintiff could not work and his sleep was affected by back and leg pain. (*Id.*) He reported that Plaintiff did not prepare meals and he did not know if he did chores in the house or yard. (AR 192.) According to Flowers, Plaintiff got out several times a day, would walk or drive and did shop. (AR 193.) Plaintiff read, watched television and interacted with people daily, but did not go anywhere regularly, according to Flowers. (AR 194.) Flowers wrote that Plaintiff's back pain affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, stair climb, complete tasks, and use hands; he said Plaintiff could walk two blocks and maybe lift twenty pounds. (AR 195.)

On October 15, 2007, Debra Meyer, a friend who had known Plaintiff for eight years, completed a function report. (AR 198.) Meyer reported that she saw Plaintiff in the evenings, once or twice a week to watch television and visit. (*Id.*) Meyer stated that Plaintiff took care of his daughter every other weekend and cared for a dog; she stated his parents helped him but she did not know in what way. (AR 199.) Meyer said Plaintiff fixed sandwiches and meals when his parents were away; she did not know if his cooking had changed since he was injured. (AR 200.) She also did not know whether Plaintiff did any chores in the house or yard (*id.*), but said he could no longer "work around the house" (AR 202). Meyer reported that Plaintiff got out every day, that he drove, and that once a week he would shop for groceries or for things for his daughter. (AR 201.) She said he spent time with his daughter on weekends and friends once or twice a week, visiting, playing games and watching movies. (AR 202.) Meyer indicated that Plaintiff's ability to lift, squat, bend, stand, reach, walk and sit were impacted by his injury and that he could no longer lift anything heavy; she did not know how far he could walk without resting. (AR 203.)

ALJs must consider lay witness testimony and rejection of lay testimony requires

reasons specific to each witness. *Stout v. Comm'r, Social Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006). The ALJ's failure to address the reports of Rand, Meyer and Flowers, although error, was harmless. As explained below, the Court "confidently conclude[s] that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Id.* at 1056.

When Rand and Flowers completed their reports, in early May, Plaintiff had just returned to see Dr. Goodsell after more than a year of receiving no treatment. Thus, Rand's and Flower's statements were based on observations of Plaintiff occurring before Dr. Goodsell began providing Plaintiff ongoing treatment. The witnesses' function reports noted that most physical activities caused Plaintiff to experience back pain and that he was frequently laying in bed. These pre-treatment statements were consistent with Dr. Goodsell's April 30, 2007 notes regarding Plaintiff's untreated pain and depression. However, the records reveal that once Plaintiff began receiving treatment he made significant improvement with respect to his depression, range of motion and pain control.

Similarly, Debra Meyer's October report, at which time Plaintiff was receiving treatment, was consistent with the residual functional limitations found by the ALJ - Plaintiff had some level of limitation on lifting, standing, squatting, bending, walking, sitting and reaching. Further, she indicated Plaintiff got out every day, shopped weekly, visited with his daughter on weekends and friends once or twice a week; this is similar to Dr. Goodsell's reports that Plaintiff was getting out, improving and doing okay with treatment.

The Function Reports are consistent with other evidence in the record at the time they were completed. Crediting the reports as true, and considering all the evidence in the record and other findings by the ALJ, the Court finds that no reasonable ALJ would have reached a different disability determination. Therefore, the error was harmless.

**Step 5 Analysis**

Plaintiff alleges he is disabled at step 5 when the testimony of Plaintiff, treating and examining physicians, and the lay witnesses are given proper consideration. Because the Court found no error or harmless error regarding the testimony of Plaintiff, the examining

physicians and the lay witnesses, the Court finds that the ALJ's finding at Step 5 was not error and Plaintiff is not entitled to relief.

**CONCLUSION**

The Court concludes the ALJ did not err in assessing Plaintiff's credibility or evaluating the treating and examining doctors' opinions and, although the ALJ erred in failing to discuss lay witness testimony, the error was harmless. Therefore, Plaintiff is not entitled to relief and his appeal is denied.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Dkt. 24) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's case is **DISMISSED** and the Clerk of Court shall enter judgment.

DATED this 1st day of October, 2009.

D. Thomas Ferraro
United States Magistrate Judge
